**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**PATSY LESTER for
CHRISSY DAWN LESTER,
Deceased,**

       **Plaintiff,**

**vs.**                           **CIVIL ACTION NO. 1:18-CV-00906**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

       **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered May 10, 2018 (ECF No. 2), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Brief in support of her Complaint and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 17, 20)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request to reverse the final decision (ECF No. 17), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 20); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

1

**Procedural History**

The deceased, Chrissy Dawn Lester, (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on April 23, 2014 alleging disability since December 30, 2013, because of "diabetes, left knee dislocation, bad nerves, depression, anxiety, bronchial asthma, and peripheral arterial disease."[1] (Tr. at 3050) Her claim was initially denied on September 9, 2014 (Tr. at 2920-2924) and again upon reconsideration on March 18, 2015. (Tr. at 2926-2928) On April 16, 2015, Claimant filed a written request for hearing. (Tr. at 2929) An administrative hearing was held on August 9, 2016 before the Honorable Michael E. Mance, Administrative Law Judge ("ALJ").[2] (Tr. at 2859-2887) On December 7, 2016, the ALJ entered an unfavorable decision. (Tr. at 2731-2751) On February 10, 2017, Claimant sought review by the Appeals Council of the ALJ's decision.[3] (Tr. at 3013) The ALJ's decision became the final decision of the Commissioner on March 22, 2018 when the Appeals Council denied Claimant's Request. (Tr. at 1-7)

On May 9, 2018, Plaintiff acting *pro se*, Patsy Lester, Claimant's mother (hereinafter referred to as "Plaintiff"), timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).[4] (ECF No. 1) Defendant (hereinafter

---

[1] In her Disability Report – Appeal, submitted on January 23, 2015, Claimant alleged that her memory had worsened where she often forgot what she was doing, even driving to the store or anywhere and that her left knee and leg stays swollen and hurts preventing her from walking up or down steps; she reported that "[t]he panic attacks are coming back" and cause her breathing problems where she blacks out, though inhalers help a little bit. (Tr. at 3078) She stated that Dr. Rago diagnosed her with bipolar disorder and severe depression and started her on medication for same. (Tr. at 3079) In a subsequent Disability Report – Appeal, submitted on April 28, 2015, Claimant alleged that both her mental and physical conditions got worse. (Tr. at 3099)

[2] The record shows that Claimant obtained counsel on June 29, 2015. (Tr. at 2949) She was represented by counsel at the administration hearing and during her appeal to the Appeals Council.

[3] Claimant submitted a statement establishing good cause for the untimely filing and requested an extension in order to submit additional medical records. (Tr. at 2728) The Appeal Council granted the request for more time. (Tr. at 8-10)

[4] Plaintiff brought this appeal on behalf of Claimant, who died on March 28, 2018. (ECF No. 1 at 3) Plaintiff stated that she has guardianship over Claimant's minor daughter, who is 15 years old, and asserted that she should receive

referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 14, 15) Subsequently, Plaintiff filed her Brief in support of her Complaint, (ECF No. 17), and in response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 20) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 34 years old as of the alleged onset date, and considered a "younger person", throughout the underlying proceeding. See 20 C.F.R. § 404.1563(c). (Tr. at 3076) Claimant completed one year of college resulting in an LPN degree in 2000. (Tr. at 3051) She worked as a nursing assistant for two years prior to obtaining her degree and worked in the hospital and home health fields from 2000 through 2013. (Tr. at 2873, 3051)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of

Claimant's "back pay benefits plus [Plaintiff] have provided for said child and paid [Claimant's] house payments for the past 6 years plus insurance, [Claimant] had planned to pay me back when she received her back pay benefits." (Id. at 4) As an initial matter, the undersigned agrees with the Commissioner (ECF No. 20 at 2, n.2) that to the extent that Plaintiff has guardianship over Claimant's surviving child, she may prosecute this action on behalf of Claimant's surviving child, however, the surviving child enjoys priority entitlement to any proceeds awarded, as Claimant was divorced at the time of her death. (Tr. at 3014) See 20 C.F.R. § 404.503(b)(2).

Because Plaintiff is proceeding *pro se*, the Court is mindful that the requirement to liberally construe *pro se* documents and to hold them to a less stringent standard than those drafted by attorneys applies. Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Loe v. Armistead, 582 F.2d 1291, 1295 (1978). Liberal construction, however, "does not require courts to construct arguments or theories for a *pro se* plaintiff because this would place a court in the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." Miller v. Jack, 2007 WL 2050409, at *3 (N.D.W. Va. 2007)(citing Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978)). Further, liberal construction does not require the "courts to conjure up questions never squarely presented to them." Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). In other words, a court may not construct legal argument for a plaintiff. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Finally, the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a claim currently cognizable in a federal district court. Weller v. Department of Social Servs., 901 F.2d 387 (4th Cir. 1990)).

any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §

4

404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c).[5] Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities

---

[5] It is noted that this Section has since been updated, however, at the time of Claimant's application and administrative hearing, the prior Section was in effect.

of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).[6] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

---

[6] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2018. (Tr. at 2736, Finding No. 1) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of December 30, 2013. (Id., Finding No. 2) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: insulin-dependent diabetes mellitus; asthma; obesity; peripheral vascular disease; post-traumatic stress disorder; bipolar disorder; and mild osteoarthritis of the left knee. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 2737, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work:

> except she can never climb ladders, ropes, or scaffolds, can occasionally climb ramps and stairs, as well as stoop, crouch, crawl, and kneel. She should work in a temperature-controlled environment and must avoid concentrated exposure to pulmonary irritants, excessive vibrations, unprotected heights, and hazardous machinery. Finally, the claimant is limited to performing only unskilled work.

(Tr. at 2740, Finding No. 5) At step four, the ALJ found Claimant was unable to perform any past relevant work. (Tr. at 2744, Finding No. 6) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant can perform. (Tr. at 2745, Finding Nos. 7-10.) Finally, the ALJ determined Claimant had not been under a disability from December 30, 2013 through the date of the decision. (Tr. at 2746, Finding No. 11)

**Plaintiff's Challenges to the Commissioner's Decision**

Plaintiff states that her daughter, the Claimant, died on March 28, 2018 after a long illness.

(ECF No. 17 at 1) Plaintiff alleges that Claimant underwent open heart surgery in 2016 at St. Mary's Hospital in Huntington, West Virginia, during which the tricuspid valve was "cleaned", but asserts that Claimant did not fully recover from this surgery and had open heart surgery again in 2017 at Pikeville Medical Center in Pikeville, Kentucky to replace the tricuspid valve with a pig valve. (Id.) After several weeks in the hospital, Claimant was released home, but after a few months she was re-admitted to Pikeville Medical Center in January 2018. (Id.) A few days later, Claimant went into cardiac arrest and placed on life support. (Id. at 1-2) Claimant began to breathe on her own again and was transferred to Welch Community Hospital in the "Long Term Unit" in February 2018 where she remained until she passed away on March 28, 2018. (Id. at 2)

Plaintiff states that Claimant had prior diagnoses of bi-polar, depression, vascular problems, restless leg syndrome and that her legs were severely swollen preventing her from staying on her legs all day, which caused Claimant to have to quit her job at Welch Community Hospital where she had worked for ten years. (Id.) Plaintiff asserts that Claimant then tried to work at Home Health, believing that it would not be as painful on her legs, but because Claimant could no longer do this job, Plaintiff encouraged Claimant to apply for disability benefits. (Id. at 2-3)

Plaintiff alleges that Claimant was denied benefits due to her age and education. (Id. at 3) Plaintiff states that Claimant is survived by her sixteen-year old daughter, over whom Plaintiff has "full guardianship." (Id.) Plaintiff states that she has supported Claimant's daughter, paid Claimant's debts, and that Claimant was to reimburse her when she received disability benefits. (Id.)

The Commissioner contends that the ALJ's decision is supported by substantial evidence. (ECF No. 20 at 10) The Commissioner points out that no physician or other medical source opined

that Claimant was disabled, which "is surely probative of non-disability." See Thompson v. Halter, 45 Fed.Appx. 146, 148 (3d Cir. 2002) (citing Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999); Dumas v. Schweiker, 712 F.2d 1545 (2d Cir. 1983). (Id.) Additionally, the ALJ noted that Claimant's impairments existed prior to her alleged onset date and that the record did not demonstrate an increase in symptoms. (Id. at 10-11)

The Commissioner states that the ALJ compared the medical records with Claimant's alleged symptoms and found that her testimony regarding the severity of her impairments was inconsistent, particularly with respect to her ability to stand and walk. (Id. at 11) This is further supported by the ALJ's observation that the findings of Claimant's own treating physician, Dr. Rago, did not support her allegations concerning her lower extremity symptoms and limitations. (Id.) Nevertheless, the ALJ accounted for Claimant's lower extremity impairments in the RFC assessment with additional postural limitations. (Id. at 11-12) With respect to Claimant's asthma, which necessitated the use of an inhaler, Dr. Rago also found her breathing not as impaired as Claimant alleged, however, again, the ALJ accounted for this in the RFC assessment by limiting Claimant's exposure to pulmonary irritants and temperature extremes. (Id. at 12)

With regard to Claimant's diabetes, the ALJ found that the record did not document any diabetic-related complications, such as ketoacidosis, however, he accommodated this impairment by limiting Claimant's exposure to unprotected heights and hazardous machinery in his RFC assessment. (Id.) There was also no evidence that Claimant's obesity imposed any additional significant limitations. (Id.)

With regard to Claimant's mental impairments, the Commissioner points out that the record is sparse concerning mental health treatment and notably, Claimant's treating physician Dr. Rago

conducted a mental status examination at the Agency's request that was normal. (Id. at 12-13) The ALJ accommodated Claimant's credibly-established mental impairments by limiting her to unskilled work. (Id. at 13)

Because the RFC is supported by substantial evidence and that the vocational expert opined that an individual such as Claimant with her background and RFC, there were other jobs she could do, thus, the ALJ had no choice but to find Claimant was not disabled within the meaning of the Act. (Id. at 10, 13)

Finally, the Commissioner argues that the additional evidence that Claimant submitted to the Appeals Council did not warrant remand because the ALJ's decision was supported by substantial evidence. (Id. at 14-15) The additional evidence concerned medical records from September 2016 when Claimant was hospitalized due to MRSA associated endocarditis involving her tricuspid valve; though Claimant reported that she had not used IV drugs for about a year, test results were positive for drug use and she ultimately underwent a tricuspid valve replacement. (Id. at 15) Claimant was discharged and her only restrictions were no heavy lifting or driving for six weeks. (Id.) The additional medical records contained no additional functional limitations already accounted for in the ALJ's RFC assessment and posed no reasonable possibility that the new evidence would have changed the outcome of the ALJ's decision. (Id.) This also includes the August 2017 hospitalization – since the ALJ's decision was in December 2016, this additional medical evidence is unrelated to the period at issue and does not provide a basis for remand. (Id.)

The Commissioner asks the Court to affirm the final decision. (Id.)

**The Relevant Evidence of Record**[7]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

**Physical Impairments:**

Treating Physicians:

In October 2013, Claimant saw Romulo Dela Rosa, M.D. for medication refills and reported uncontrolled sugars. (Tr. at 3151) Dr. Dela Rosa diagnosed pelvic pain and diabetes "not stated as uncontrolled, without mention of complication." (Id.) In December 2013, Claimant again presented for medication refills and reported that her "sugars [are] doing good." (Tr. at 3149) However, by January 2014, Claimant reported that her sugars were not controlled. (Tr. at 3148) Examination findings from these visits show that Claimant's pulse oxygen level was 97-98%, but Dr. Dela Rosa heard some wheezing on examination. (Tr. at 3148-3151) The examination of Claimant's back, extremities, and neurological system were all normal. (Id.)

Dr. Rago, who saw Claimant as a private patient (Tr. at 3160-3166, 3192-3199), conducted a disability examination at the Agency's request in August 2014.[8] (Tr. at 3184-3190) Dr. Rago observed that Claimant ambulated without an assistive device and had a normal station and gait. (Tr. at 3186) She could walk on her heels, but not her toes due to left foot pain. (Id.) She could squat and had no difficulty getting on and off the examination table. (Id.) She had "good breath sounds bilaterally" and "no respiratory wheezes." (Id.) Her heart had a regular rate and rhythm, no

---

[7] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings; Plaintiff submitted a thumb drive containing the voluminous medical record as an attachment to her Complaint.

[8] The record indicates that Dr. Rago performed an earlier evaluation of Claimant on behalf of the Agency in January 2008 (Tr. at 3131); Claimant had previously filed applications for a period of disability and disability insurance benefits but did not pursue an appeal after the initial denial. (Tr. at 2734)

murmur or splitting of heart sounds. (Tr. at 3187) Claimant had a "slight" limitation of motion in

her arms and left hip joint; no clubbing or cyanosis and peripheral pulses were palpable and equal

and no pedal edema. (Id.) There was no area of tenderness or abnormal curvatures noted in the

spine, however, she had "slight" tenderness "more at the left buttock." (Id.) Claimant was

neurologically intact. (Id.) Claimant's mental status examination was also normal. (Id.) Dr. Rago

concluded:

1.  The claimant has type 1 diabetes and taking medication accordingly. She also
    has bronchial asthma and taking bronchodilator in the form of inhaler. She was
    diagnosed to have peripheral vascular disease and used to take Plavix and low-
    dose aspirin. She has injury to the left knee after a[n] all-terrain vehicle
    accident.[9] She underwent treatment through a home healthcare personnel who
    attended to her injury to the left knee (open wound, which eventually healed).

2.  She has chronic anxiety characterized as panic disorder. She also has
    depressive symptoms associated with racing thoughts and mood swings
    suggestive of bipolar disorder. At present, she is taking anti-anxiety
    medication at bedtime.

(Tr. at 3187-3188)

Welch Community Hospital:

In March 2014, Claimant presented to the hospital with a lump in her left leg. (Tr. at 3155)

The emergency room physician noted that a recent CT scan showed some stranding of fat in

Claimant's left leg, but no tumor. (Id.) The physician opined that Claimant had a venous

insufficiency for which he recommended support stockings. (Id.) The record also contains various

diagnostic tests from July 2014, including: (1) an x-ray of Claimant's left knee showing "mild"

degenerative joint disease, no fracture or dislocation and intact patella, and soft tissues within

---

[9] In or around September 2007, Claimant was in an ATV accident in which she sustained a pelvic fracture. (Tr. at 3136) The fracture healed, but in May 2008, Claimant reported left hip pain and was diagnosed with a heterotopic bone formation due to the trauma (Tr. at 3136-3137) that was surgically removed. (Tr. at 3138)

normal limits (Tr. at 3169); (2) a chest x-ray indicating chronic interstitial lung disease without evidence of an acute cardiopulmonary process (Tr. at 3168); and (3) a pulmonary function test which was within normal limits. (Tr. at 3171)

State Agency Medical Consultants:

In September 2014, Navjeet Singh, M.D. reviewed the available record an opined that Claimant retained the ability to perform a range of light work activities. (Tr. at 2896-2897) In March 2015, Subhash Gajendragadkar, M.D. concurred with Dr. Singh's findings. (Tr. at 2913-2915)

Cabell Huntington Hospital:

In April 2016, Claimant was hospitalized with "MRSA bacteremia with cavitary lung lesions and septic lung emboli related to IV drug use." (Tr. at 3279) A transesophageal echocardiography (TEE) revealed small vegetation seen on the septal tricuspid valve leaflet consistent with endocarditis. (Id.) She was also diagnosed with infective endocarditis with tricuspid septal lesion. (Tr. at 3278) The discharging physician strongly encouraged Claimant to avoid all drug use to prevent further infection. (Tr. at 3279) Claimant expressed interest in seeking outpatient treatment for her IV drug use. (Tr. at 3278)

Evidence Submitted to Appeals Council:

In September 2016, Claimant was hospitalized with MRSA associated endocarditis involving the tricuspid valve with septic shock and septic emboli. (Tr. at 2769, 2771-2772, 2774) She reported that she had not used IV drugs for about a year, but her blood cultures and a drug screen both came back positive. (Tr. at 2769) Claimant underwent a tricuspid valve replacement and "progressed very well" afterwards with no significant complications in the postoperative period. (Tr. at 2753-2755) At discharge, Claimant's activities were restricted to no heaving lifting

13

or driving for six weeks. (Tr. at 2754)

In August 2017, Claimant relapsed again with IV drug use and developed another infection. (Tr. at 1228) She had MRSA and an infection of her previously replaced tricuspid valve. (Tr. at 1250) It was noted that Claimant had a history of IV drug use and she admitted to active IV drug use. (Id.) Cardiac surgeons had to "redo" Claimant's sternotomy and tricuspid valve. (Id.) She was hospitalized from August 7, 2017 through September 18, 2017 because she could not be discharged with a PICC line due to her drug use and needed to remain in the hospital until she completed a course of antibiotics and had the line removed. (Tr. at 1250-1251) Following surgery, Claimant experienced a complete heart block, requiring the placement of a permanent pacemaker. (Tr. at 1251) Upon discharge, it was noted that Claimant was doing well overall, with normal laboratory work and chest x-ray and she was "without any complaints." (Id.)

**Mental Impairments:**

<u>Psychological Examination Reports:</u>

In August 2014, Sunny S. Bell, M.A. conducted a consultative psychological examination of Claimant. (Tr. at 3176-3181).[10] Claimant reported that her family physician prescribed her psychotropic medication, which she believed helped. (Tr. at 3178) She denied that she ever had problems with drugs or alcohol. (Id.) On mental status examination, Claimant appeared clean and

---

[10] The record shows that Ms. Bell saw Claimant in July 2010 in connection with a prior application for disability. (Tr. at 3140-3144) At that time, Ms. Bell diagnosed Claimant with depressive disorder, not otherwise specified and panic disorder, with agoraphobia. (Tr. at 3143) Ms. Bell explained these diagnoses based on Claimant's presentation at the time in a depressed mood with a blunted affect, having become tearful during the interview, due to her complaints of depressive symptoms, and that Claimant complained of panic attacks that occurred "when she finds herself around people." (Tr. at 3143-3144) Ms. Bell noted that Claimant described her typical day as taking care of her daughter and "run her to Tee-Ball and to cheer practice", and that she attended church once per week and "relates well with the congregation" and attends "extra-church activities" as well as "her daughter's school functions and sporting events" and "occasionally eats out." (Tr. at 3144) Based on the interview and mental status examination, Ms. Bell found Claimant's social functioning to be within normal limits. (Id.)

casually dressed, with good hygiene. (Tr. at 3179) She was cooperative and interacted in a socially appropriate manner, with good eye contact and normal speech. (Id.) She was aware of the year and day of the week, but not the month or date. (Id.) Her mood appeared depressed and her affect restricted. (Id.) Her thought process and content were normal. (Id.) She alleged having visual hallucinations, although no perceptual problems were observed on examination. (Id.) Although Claimant's recent memory appeared moderately deficient, her immediate and remote memory were normal and her concentration was "mildly" deficient. (Id.) Ms. Bell found Claimant's persistence and pace within normal limits. (Tr. at 3181) Ms. Bell diagnosed an unspecified depressive disorder, a panic disorder, and a generalized anxiety disorder (Tr. 3180). She also diagnosed major neurocognitive disorder due Claimant's report of a traumatic brain injury, causing her difficulties in concentration, decision making, as well as problems with memory, confusion, and aphasia. (Tr. at 3177-3178, 3180)

Lantern Mental Health, Inc.:

In July 2015, Claimant presented to Lantern Mental Health, Inc., having been referred by Dr. Rago for treatment of manic depression, severe panic attacks, nervousness, and depression. (Tr. at 3208-3216) She did not keep her next two appointments. (Tr. at 3206-3207) In February 2016, she presented for individual therapy and reported a depression level of 8/10. (Tr. at 3205) Brian Lueck, M.A. and David Lawson, M.A., both clinical psychologists, recommended therapy for Claimant's PTSD, however, "she declined and said she would 'think about it.'" (Tr. at 3205) Both psychologists opined that Claimant did not respond to therapy very well that day. (Id.) At the next visit, in March 2016, Claimant continued to report depression, but stated that she was willing to try therapy. (Tr. at 3204) One month later, in April 2016, Claimant was noticeably more alert

and exhibited a more positive affect. (Tr. at 3203) She reported that she had been doing " 'pretty well.' " (Id.) However, she failed to return to treatment. (Tr. at 3201-3202)

State Agency Psychological Consultants:

Following Ms. Bell's consultative examination, in August 2014, Jeff Harlow, Ph.D. reviewed the available evidence of record and opined that Claimant had moderate deficits in memory and concentration, but retained the ability to understand, remember, and carry-out short and simple instructions. (Tr. at 2898-2899) Dr. Harlow opined that Claimant could perform repetitive one and two-step work like activities. (Tr. at 2899-2900) In March 2015, Paula Bickham, Ph.D. reviewed the record and affirmed Dr. Harlow's assessment. (Tr. at 2915-2917)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she last worked in 2013 and stated that her history of ATV wrecks and motor vehicle accidents prevented her from working: she fractured her pelvis and hip; had only half a knee cap; injured her ankle; and had throbbing pain and swelling in her feet, legs and hip. (Tr. at 2864) She stated that she had to quit working because her legs were throbbing with pain and were swollen, including her feet and hands, and she had to take numerous breaks throughout her shifts, but then had to take two or three days off to recuperate. (Tr. at 2873) She tried to stay working and left the hospital for Home Health believing it would be easier, but after a while, she ended up doing the same type of work. (Tr. at 2878) She testified that she was noticing she would write things in a patient's chart that made no sense and began to worry that she may mix medications and dosages and might hurt a patient. (Id.)

She explained that she injured her hip in a 2007 ATV wreck and had two surgeries on it in 2008. (Tr. at 2865) Her hip injury was also treated with shots and medication for pain and inflammation. (Id.) Claimant stated that this ATV wreck was the start for all her physical ailments and they had grown worse ever since. (Tr. at 2874)

Claimant testified that since the ATV wreck she had totaled about 11 or 12 cars. (Id.) She explained the cause of her multiple motor vehicle accidents is that she would black out and "was witnessed having seizures on a couple" and she usually came to in a hospital or ambulance. (Id.) She estimated she experienced at least one seizure a month; she did not know when they were coming on, but felt sluggish after they were over. (Tr. at 2875) She testified that she had a seizure "last week" and her daughter observed her seize, and described the episode where Claimant would sit and shake with her teeth clenched for about 20 minutes. (Id.) Claimant testified that her last motor vehicle accident was about 11 to 12 months previously and that she was "in CAMC for three and a half weeks." (Tr. at 2864) She was treating at the trauma center at the hospital, then with Dr. Dela Rosa, and then with Dr. Rago. (Id.) Claimant testified that she had a seizure and hit a girl head-on, and suffered from a lacerated scalp and reinjured her left knee. (Tr. at 2864-2865) Claimant testified that she still drives "a little" if she can talk somebody to go with her, but she will not go anywhere by herself. (Tr. at 2871) Claimant has asked her doctors if it was okay for her to drive, and testified that Dr. Dela Rosa prescribed her Topamax to help her seizures. (Tr. at 2879) She did not experience any seizures for the two months she was taking this medication, but Dr. Dela Rosa took her off of it and then he retired; she stated that Dr. Rago had not addressed her seizures. (Id.)

Claimant testified that she suffered from PTSD as a result of her motor vehicle accidents. (Tr. at 2866) She stated that her PTSD, depression, and anxiety make her want to sleep and stay in bed a lot; she cannot be around people and she experienced having "visions" of dirt and gravel in her eyes when she goes by cars or different roads, as a result of the PTSD. (Tr. at 2875) Although she was prescribed medication for panic attacks, Claimant testified that it did not help and she experienced panic attacks "pretty often" that were triggered when she got nervous or when she was in a crowd of people, or even "one on one with somebody." (Tr. at 2868)

Claimant stated that she experienced memory loss that seemed to happen overnight; she would get in her car to go places and not remember where she was going and end up in the middle of nowhere. (Tr. at 2867) She did not drive unless someone was with her. (Id.) She estimated her memory problems started about a year and a half to two years prior to the hearing. (Tr. at 2868) She also experienced concentration and focus problems, so she could not read or follow a television program after 20 to 25 minutes. (Tr. at 2875-2876) She also forgot to do certain house chores and had gone into a convenience store several times and needed her daughter to remind her what she was going in to get because she kept forgetting. (Tr. at 2876)

Claimant had insulin dependent diabetes for about two years. (Tr. at 2866, 2872) She stated that her blood sugar was usually between 370 and 500, and though it made her really sleepy and had repeatedly advised her doctor about it, her medication had not been adjusted. (Tr. at 2872)

Claimant testified that she had endocarditis and a pulmonary embolism which caused infections in her joints, such as the bursitis in her wrist. (Tr. at 2866) She continued to be monitored for her heart condition, and that because of a defective tricuspid valve, it was probably going to be replaced. (Tr. at 2866-2867) Earlier that year, Claimant experienced chest pain, a fever, pain in

her back as well as shortness of breath that an EKG indicated was a heart attack; she had tachycardia and was hospitalized from April 24 through May 12. (Tr. at 2867) When her heart started to beat too fast, she would black out and hear bells in her ears as well as humming noises. (Tr. at 2876-2877) She recognized this was different from seizures because she is aware of it happening and her "vision goes" and she "just can't see nothing", and then it goes away after three or four minutes; she stated that she experienced this "usually on exertion." (Tr. at 2877)

Claimant estimated that she could walk or stand for about ten minutes before having to sit and rest, and sit for about ten minutes before having to stand up and stretch. (Tr. at 2869-2870) She could pick up something that weighed about five or ten pounds, but explained that if she picked anything up, she experienced pressure from her hip down to her toes. (Tr. at 2870) Usually, she would sit around and elevate her feet and legs and use ice and heat packs. (Id.) She testified that her daughter helps her bathe some and put her socks on, though she could dress herself. (Id.) Claimant stated that she often got off balance and fell. (Tr. at 2871)

Claimant fixed microwave foods and only shop when it was going in and grabbing one thing, her daughter and mother did the shopping. (Id.) Claimant would try to attend her daughter's school functions. (Id.) Claimant testified that she lived in a trailer with her daughter, and her mother lived next door to them and helped take care of her daughter and pay bills. (Tr. at 2863, 2877) Her mother and daughter reminded Claimant to take her medication as prescribed. (Tr. at 2877-2878)

Claimant stated that the rain aggravated her symptoms and had been advised to avoid being outside in the direct sun because her heart would speed up real fast. (Tr. at 2871) Claimant did not

19

think her medications caused her dizziness or blacking out spells because when her heart rate sped up, she blacked out. (Tr. at 2877)

Vocational Expert ("VE") Testimony:

The VE characterized Claimant's past work as a licensed practical nurse as skilled and medium and as Claimant performed it for Home Health, as sedentary and then medium/heavy. (Tr. at 2882) In response to the hypothetical question concerning an individual with Claimant's vocational background if limited to: (1) light exertional work; (2) occasional climbing of stairs and ramps (no climbing of ropes, ladders, or scaffolds); (3) occasional stooping, kneeling, crouching, and crawling; (4) a temperature controlled environment away from pulmonary irritants, unprotected heights, excessive vibrations, and hazardous machinery; and (5) unskilled work, the VE testified that such an individual could not perform Claimant's past work, but could perform other work that exists in significant numbers in the national economy such as a marker, mail clerk, or garment sorter. (Tr. at 2882-2883)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

<u>Age and Education as Vocational Factors:</u>

Plaintiff argues that the final decision is in error due to the Commissioner's consideration of Claimant's age and education level, but failed to consider that "for several years, [Claimant] has been at death's door." (ECF No. 1 at 3-4; ECF No. 17 at 3) The Regulations provide that a claimant's ability to adjust to other work will not be based on age alone. See 20 C.F.R. § 404.1563(a). However, because Claimant was a "younger person", the Regulations also state "we generally do not consider that your age will seriously affect your ability to adjust to other work." See <u>Id</u>. § 404.1563(c). As there is no dispute with respect to Claimant's status as a "younger person", there is also no dispute that Claimant's educational level was just beyond the high school level, and that "[h]igh school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled through skilled work." See <u>Id</u>. § 404.1564(b)(4).

In addition to both age and education, the ALJ expressly considered Claimant's work experience as a vocational factor in his decision. (Tr. at 2744) Moreover, the ALJ reviewed Claimant's RFC, and notably found that Claimant was unable to return to her past relevant work,

but based upon vocational expert testimony, did find that she could have performed other work in the national economy. (Tr. at 2745-2746) Based on the applicable Medical-Vocational Guidelines, the ALJ appropriately found that Claimant was "not disabled." (Tr. at 2746) Therefore, to the extent that Plaintiff argues the ALJ primarily based his decision on Claimant's age and education, the undersigned **FINDS** that argument lacks merit.

<u>Physical and Mental Impairments and SSR 96-8p:</u>

Plaintiff also argues that Claimant's impairments had persisted for several years, which ultimately caused her to quit working as an LPN. (ECF No. 1 at 3; ECF No. 17 at 2) Plaintiff appears to contend that the ALJ failed to assess Claimant's impairments (she specifically cites bi-polar, depression, vascular problems, and restless leg syndrome "caused by the veins in her legs were too small to carry sufficient blood supply to her legs. Her legs stayed swollen severely she got till she couldn't stay on her legs all day") (ECF No. 17 at 2) and therefore, failed to assess the affect the combination of these impairments had on Claimant's ability to function "on a regular and continuing basis" as promulgated under SSR 96-8p.[11]

An RFC determination is based "on all the relevant evidence in [the] case record", which includes "relevant medical and other evidence" as well as "statements about what [the claimant] can still do", "descriptions and observations of [the claimant's] limitations . . . provided by [the claimant] . . . [.]" See 20 C.F.R. § 404.1545(a)(1), (a)(3). A medical opinion is not necessary in formulating a claimant's RFC, however, the Regulations and controlling case law are clear that the Commissioner is obligated to consider "all" the evidence in the record. <u>Colvard v. Chater</u>, 59 F.3d 165 (4th Cir. 1995) ("The determination of a claimant's [RFC] lies with the ALJ, not a physician,

---

[11] <u>See</u> "Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims", SSR 96-8p, 1996 WL 374184, at *1-2.

and is based upon all relevant evidence.")

In this case, the ALJ first addressed Claimant's severe impairments, described *supra*, as well as her non-severe impairments which included: bursitis in the [wrist][12]; endocarditis; and history of a staph infection. (Tr. at 2736-2737) The ALJ noted that the endocarditis and staph infections were recent diagnoses, occurring between April 25, 2016 and May 8, 2016, and because they had been diagnosed within the past 12 months, none of those impairments met the durational requirement[13], and thus found them to be non-severe. (Tr. at 2736-2737, 3223, 3279, 3286, 3288) In addition, the ALJ considered Claimant's history of a bone mass in her left hip that had been excised; because it did not significantly limit her ability to perform basic work activities, the ALJ found that impairment to be non-severe.[14] (Tr. at 2737)

The ALJ also reviewed Claimant's mental impairments and performed the "special technique" required under Section 404.1520a. (Tr. at 2738-2739) For starters, the ALJ found Claimant had no restriction in her activities of daily living, noting that in her Function Report she woke and readied her child for school, cares for her daughter, including practice with her mother's help and she cooked primarily by using the microwave but also attended her daughter's school functions, watched television, cleaned her house and shopped for groceries. (Tr. at 2738) The ALJ specifically found that Claimant's alleged limitations in this area of functioning primarily concerned physical rather than mental impairments. (Id.)

The ALJ found Claimant had mild difficulties in social functioning, comparing her

---

[12] Claimant appeared at the administrative hearing wearing a sling and testified that she developed bursitis during the three weeks prior to the hearing and was being treated for it. (Tr. at 2866)

[13] 20 C.F.R. § 404.1509 provides that an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months."

[14] The record shows that Claimant underwent this procedure in June 2008, many years prior to the alleged onset date. (Tr. at 3133-3139)

statements from the Function Report and Ms. Bell's observations in the psychological consultative examination, *supra*. (Id.)

The ALJ found Claimant had moderate limitations in her concentration, persistence or pace, again referencing Claimant's allegations in the Function Report, specifically that she relied upon her mother to remind her to take her medication; however, the ALJ compared this with Claimant's reported 3.9 GPA in school which "does not reflect significant concentration, persistence, and pace difficulties." (Tr. at 2738, 3086, 3213) The ALJ further referenced Claimant's lack of special education, that she had completed one year of college as well as specialized job training as a licensed practical nurse and again compared this evidence with Ms. Bell's observations during a 2010 evaluation, when she opined Claimant had moderate limitations in concentration, persistence, and pace. (Tr. at 2738-2739, 3140-3144) However, although the ALJ acknowledged that during the 2014 evaluation Ms. Bell found Claimant had only mildly deficient concentration and normal remote and immediate memory, the ALJ determined Claimant's difficulties in this functional area were no greater than moderate. (Tr. at 2739, 3179)

Finally, the ALJ found Claimant had no episodes of decompensation of extended duration, noting her mental health treatment had been inconsistent and that none of her hospitalizations were the result of mental impairments and further, that none were anticipated. (Tr. at 2739)

The ALJ observed "a dramatic increase in adverse symptoms occurred between the 2010 and 2014 visit to [Ms. Bell][,] however, the medical records do not detail the reason for that increase." (Tr. at 2743-2744) The ALJ explained that although Ms. Bell diagnosed Claimant with traumatic brain injury, there were no CT scans or medical records to corroborate this. (Tr. at 2744) The ALJ speculated that "[i]f that diagnosis began with the claimant's 2007 motor vehicle

accident, it defies logic that it would not be mentioned in [the] 2010 examination." (Id.) Further, the ALJ noted that more recent treatment records failed to support Claimant's allegations of such an impairment and symptoms. (Id.) The ALJ noted that Claimant did not receive consistent mental health treatment in 2013 and 2014, and the most recent records from Lantern Mental Health, Inc. from April 2016 indicated that her providers found no significantly limiting symptomology related to Claimant's allegations of trauma, intrusive thoughts of trauma, concentration problems, depression, and decreased appetite; they observed Claimant "had a more positive affect" and that Claimant reported that "she was doing 'pretty well.' " (Tr. at 2744, 3203)

With regard to Claimant's physical impairments, the ALJ summarized Claimant's testimony as well as her statements contained in the Function Report, and recognized that the medical evidence of record did not substantiate her alleged limitations in walking or standing and did not demonstrate a significant worsening of her lower extremities from July 2014 through the hearing date: the ALJ noted that x-rays of Claimant's left knee showed an "intact patella, no fracture or dislocation, narrowing or the medial and patellofemoral compartments, spurring of the medial femoral condyle, and no joint diffusion" but "only mild degenerative joint disease of the left knee." (Tr. at 2741, 3169)

The ALJ also considered the examination findings provided by Dr. Rago on behalf of the Disability Determination Service in August 2014 which the ALJ observed to also be inconsistent with Claimant's allegations regarding her lower extremity symptoms and limitations: she walked without an assistive device; had normal gait; was stable at station; had no difficulty arising from the seated position; though left toe pain prevented her from walking on her toes and she could squat with slight difficulty. (Tr. at 2742, 3186) The ALJ acknowledged Dr. Rago noted Claimant

had peripheral vascular disease and a prior left knee injury, and that Dr. Rago observed "that she had no gross deformity, unremarkable limitation of motion of the upper extremities and left lower hip, and equal and palpable peripheral pulses. (Tr. at 2742, 3187)

It was further noted that Dr. Rago acknowledged Claimant's asthma and diabetes and that she was taking medication for these conditions which was supported by the medical record, however, the ALJ reconciled these findings and found that "the records at the time and subsequently" did not establish limitations as a result of those impairments that conflicted with the RFC. (Tr. at 2742) For instance, her pulmonary function studies from July 2014 were normal and x-rays of her chest indicated a pulmonary vasculature within normal limits as well as a normal-sized heart. (Tr. at 2742, 3168, 3171) Claimant's April 2016 pulmonary consultation with Kara Willenburg, M.D. was also reviewed by the ALJ, who noted that Claimant denied shortness of breath or wheezing but reported chest pain, and upon examination, Claimant appeared to Dr. Willenburg to be healthy, in no acute distress and that she moved all extremities without erythema, effusion, or tenderness, and that her lungs were clear to auscultation, though she "had some pain with deep inspiration." (Tr. at 2742, 3299) The ALJ also noted that Dr. Willenburg observed track marks on Claimant's "hands and possible her ankles, but the claimant attributed them to IV drug use that ended eight years earlier and a recent hospitalization." (Tr. at 2742, 3300) Drug testing was positive for benzodiazepines and a subsequent test was positive for oxycodone, though this did not indicate street drug use. (Tr. at 2742, 3252, 3255)

With respect to Claimant's diabetes, the ALJ observed that the medical evidence did not "repeatedly document that claimant has any common diabetes-related complications" and noted that an echocardiography on April 25, 2016 was essentially normal. (Tr. at 2742, 3286) Further,

though Claimant was medicated for diabetes, the ALJ noted that records as of January 23, 2014 showed that at the time, her diabetes was non-insulin dependent, uncomplicated and controlled. (Tr. at 2743, 3148)

Next, the ALJ considered Claimant's obesity under SSR 02-1p[15], finding that "there is not persuasive evidence that that diagnosis is accompanied by significant degenerative joint disease or degenerative disc disease . . . results in significantly reduced respiratory capacity, skin disorders, edema, huge calluses on the claimant's feet, or significant cardiac-related impairments." (Tr. at 2743) Importantly, the ALJ observed that "[n]o treating physician has reported the claimant's obesity results in severe symptoms and limitations[.]" (Id.)

Finally, the ALJ considered Claimant's pain under 20 C.F.R. § 404.1529, SSR 96-4p[16] and SSR 96-7p[17] asserting "[w]hile the claimant's records indicate some impairments and limitations equally telling is what they do not note[:]" Claimant received no medical treatment for her physical impairments in 2015.[18] (Id.) The ALJ went to explain that the medical records did not demonstrate that Claimant's combination of impairments precluded her from all work and no physician cited any significant limitation beyond those in the RFC; "[t]hese facts fail to support the allegations

---

[15] See "Titles II and XVI: Evaluation of Obesity", SSR 02-1p, 2002 WL 3468281.

[16] See "Policy Interpretation Ruling Titles II and XVI: Symptoms, Medically Determinable Physical and Mental Impairments, and Exertional and Nonexertional Limitations", SSR 96-4p, 1996 WL 374187.

[17] This Ruling was superseded by SSR 16-3p and became effective March 28, 2016, and therefore governed the ALJ's decision herein. See, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1. Though the ALJ cited the prior Ruling in his decision, he clearly followed the construct of the new Ruling, having observed numerous times throughout the decision regarding the "consistency" of Claimant's statements, ultimately determining that her statements and allegations concerning the intensity, persistence and limiting effects of her symptoms were "not entirely consistent" with the medical and other evidence of record. (Tr. at 2744) Accordingly, the ALJ's findings pursuant to the Ruling are not in error.

[18] This is a glaring inconsistency in the record given Claimant's testimony that she was hospitalized for three and a half weeks for trauma to her scalp and re-injury to her left knee as a result of a motor vehicle accident that occurred eleven or twelve months prior to the August 9, 2016 hearing. (Tr. at 2864)

and testimony made by the claimant as to her limitations during the hearing." (Id.)

The ALJ supported his findings and conclusions by specific citations to the evidence of record, and therefore supported by substantial evidence. See, generally, Richardson v. Perales, 402 U.S. 389, 390 (1971) ("The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Additionally, the ALJ's written decision indicates that his explanations sufficiently meet the Fourth Circuit standard under Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986) and Hammond v. Heckler, 765 F.2d 424 (4th Cir. 1985). It is apparent that the ALJ complied with the pertinent Regulations and Rulings with regard to Claimant's impairments, both severe and non-severe, mental and physical.

Accordingly, the undersigned **FINDS** the ALJ's findings and conclusions related to his reconciliation of the medical and other evidence as well as the conflicts therein, as well as his assessment of the RFC are supported by the substantial evidence.

Evidence Submitted to Appeals Council:

Plaintiff's other argument concerns the medical evidence that Claimant underwent open heart surgery in September 2016 and again in August 2017.[19] (ECF No. 1 at 3; ECF No. 17 at 1) The undersigned interprets Plaintiff's argument that this additional evidence necessitates remand pursuant to the fourth sentence of 42 U.S.C. § 405(g). As described supra, Claimant submitted additional evidence after the ALJ issued his decision to the Appeals Council. Social Security Regulations allow two types of remand. Under the fourth sentence of 42 U.S.C. § 405(g), a court has the general power to affirm, modify or reverse the decision of the Commissioner, with or

---

[19] Plaintiff alleged that these surgeries occurred in October 2016 and October 2017, however, the medical records are clear that these procedures occurred in September 2016 and August 2017 respectively.

without remanding the cause for rehearing for further development of the evidence. 42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 97-98, 111 S.Ct. 2157, 2163, 115 L.Ed.2d 78 (1991). Where there is new medical evidence, a court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence. 42 U.S.C. § 405(g); Melkonyan, 501 U.S. at 98, 111 S.Ct. at 2163. The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute. Melkonyan, 501 U.S. at 98, 111 S.Ct. at 2163.

Pursuant to 28 U.S.C. § 405(g), remand is warranted "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" Evidence is "new" if it is not duplicative or cumulative. Wilkins v. Secretary, Dep't of Health & Human Serv., 953 F.2d 93, 96 (4th Cir. 1991) (en banc). "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id. The Regulations governing the circumstances under which the Appeals Council is to review an ALJ decision shows that additional evidence will not be considered unless the evidence is new and material and relates to the period on or before the date of the ALJ decision. See 20 C.F.R. § 404.970(b). This does not mean that the evidence had to have existed during that period; rather, evidence must be considered if it has any bearing upon whether the claimant was disabled during the relevant period of time. See Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987); Cox v. Heckler, 770 F.2d 411, 413 (4th Cir. 1985); Leviner v. Richardson, 443 F.2d 1338, 1343 (4th Cir. 1971). "Pursuant to the regulations . . . , if additional evidence submitted by a claimant does not relate to the time period on or before the ALJ's decision, the evidence is returned

to the claimant, and the claimant is advised about her rights to file a new application." Adkins v. Barnhart, 2003 WL 21105103, *5 (S.D.W. Va. May 5, 2003).

Claimant submitted additional evidence to the Appeals Council that concerned her hospitalization in September 2016 due to MRSA associated endocarditis involving the tricuspid valve with septic shock and a septic emboli. (Tr. at 2769, 2771-2772, 2774) The record demonstrated that Claimant denied using IV drugs, however, drug testing results were positive. (Tr. at 2769) As a result of these conditions, Claimant underwent a tricuspid valve replacement (Tr. at 2753-2755). Other than being restricted from driving for six weeks and to avoid heavy lifting, the record provided no additional limitations. (Tr. at 2754) There were no additional functional limitations ascribed to Claimant as a result of this procedure. As noted *supra*, the ALJ limited Claimant to light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." See 20 C.F.R. § 404.1567(b). Moreover, the vocational expert identified several sedentary exertion level jobs that Claimant could perform that included the same postural limitations from the controlling RFC (Tr. at 2883-2885); sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledges, and small tools." See Id. § 404.1567(a). There is no evidence in the record that Claimant experienced complications after her September 2016 hospitalization or that she required additional medical treatment. Although this medical evidence was "new", it was not "material" because it did not present a reasonable possibility that the outcome of the ALJ's decision would have changed per Wilkins, 953 F.2d 93 at 96.

Lastly, because the medical evidence concerning Claimant's hospitalization in August 2017 did not relate to the time period on or before the ALJ's decision, this evidence does not

warrant remand under Section 404.970(b) and controlling law.

The undersigned **FINDS** that in light of the ALJ's analysis of the evidence of record, the final decision denying Claimant's application for benefits is supported by the substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal of the final decision (ECF No. 17), **GRANT** the Defendant's request to affirm the final decision (ECF No. 20), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933

(1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: October 23, 2018.


Omar J. Aboulhosn
United States Magistrate Judge